UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

LAUREN SUAREZ and PEDRO MELO,

                     Plaintiffs,

        -against-

CARTER MURRAY, CARMEN MURRAY, and
FCB WORLDWIDE, INC,

                    Defendants.

-----------------------------------------------------------------X

**OPINION & ORDER**

20 Civ. 3514 (JCM)

On October 23, 2020, Plaintiffs Lauren Suarez ("Suarez") and Pedro Melo ("Melo") (collectively, "Plaintiffs"), filed a Second Amended Complaint ("SAC") against Defendants Carter Murray, Carmen Murray (collectively, "Murrays") and FCB Worldwide, Inc. ("FCB") (collectively, "Defendants") pursuant to the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL") for unpaid minimum wage, unpaid overtime, spread of hours, statutory damages, retaliation for bringing the instant suit, breach of contract and alternatively, breach of quasi-contract to recover unpaid wages. (Docket No. 39).  On October 23, 2020, Defendant FCB filed a motion to dismiss Plaintiffs' claims against it ("Motion to Dismiss") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, (Docket No. 40), accompanied by a memorandum of law ("Def. Br."), (Docket No. 41).  Plaintiffs opposed the Motion to Dismiss on November 13, 2020 ("Pl. Opp."), (Docket No. 44), and FCB replied on November 20, 2020 ("Def. Reply"), (Docket No. 45).  For the following reasons, FCB's Motion to Dismiss is granted in its entirety and Plaintiffs' claims against FCB are dismissed.[1]

---

[1] This action is before the Court for all purposes on the consent of the parties, pursuant to 28 U.S.C. §636(c) and Fed. R. Civ. P. 73. (Docket No. 12).

## I. BACKGROUND

The Court accepts as true the factual allegations in the SAC for the purpose of resolving the instant motion. *See Montgomery v. Holland*, 408 F. Supp. 3d 353, 361 (S.D.N.Y. 2019) ("In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor") (citing *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007)).

### A. Factual Allegations

FCB "is one of the worlds' largest global advertising" agencies, which employs over 8,000 people in 80 countries. (SAC ¶¶ 11–12). Carter Murray is FCB's Worldwide Chief Executive Officer ("CEO") and works predominantly in FCB's New York City office. (*See id.* ¶¶ 7, 10). Carter Murray and his wife, Carmen Murray, own a second home located at 18-28 Old Post Road, Staatsburg, New York, 12580 ("Residence"). (*Id.* ¶ 19). The Residence includes a "10,000 square foot, eight-bedroom, five and one-half bathroom, three level single family home" ("Main House"), a "historical barn facility" ("Barn") and a 400 square foot studio apartment ("Apartment") above a free standing two car garage. (*Id.* ¶¶ 38, 58, 61). The Residence is referenced in FCB's marketing materials an as "offsite meeting space." (*Id.* ¶ 21) (internal quotations omitted).

In or around January 2018, Plaintiffs responded to a Craigslist advertisement posted by the Murrays seeking two live-in caretakers at the Residence. (*Id.* ¶ 22). The Murrays arranged a virtual interview between Plaintiffs and Carter Murray. (*Id.* ¶ 23). The following week, the Murrays invited Plaintiffs to the Residence for an in-person interview. (*Id.* ¶ 27). The Murrays paid for Plaintiffs' Metro North train fare from New York City to the Residence for the interview. (*Id.* ¶ 28). Approximately two days after the in-person interview, Carter Murray telephoned Plaintiffs and offered Suarez a

position as a full-time housekeeper and Melo a position as a private chef. (*Id.* ¶¶ 30, 62–63).  Plaintiffs accepted the job offers. (*See id.* ¶ 30).  Thereafter, in late January 2018, Carter Murray sent Plaintiffs a "Caretaker Agreement" ("Employment Agreement") memorializing the terms of their impending employment. (*Id.* ¶ 31).

> The Employment Agreement provided, *inter alia*, that:
>
> A. During the [Murrays]' occupancy of the residence and/or any invitees including but not limited to family members, friends, business associates. [sic] the [Plaintiffs] shall devote full-time care to the real property including, but not limited to all duties listed above. During such period of occupancy, the [Plaintiffs] shall not be entitled to any free days.
>
> B. During the [Murrays] non-occupancy . . . the caretakers shall be entitled to time off subsequent to all work being performed at the real property.

(*Id.* ¶ 33).  The Employment Agreement specified that Plaintiffs were to receive an annual gross salary of $21,000.00, would reside in the Apartment, and would be permitted use of a car ("Subaru") leased by Carter Murray when it was not being used by the Murrays. (*Id.* ¶¶ 35, 37–38).  The Employment Agreement did not specify, nor were Plaintiffs otherwise given written notice of, *inter alia*, their underlying hourly rate or their overtime pay rate, whether they were "paid by the hour[,] shift, day[,] [or] week," whether tip, meal, or lodging allowances were claimed as part of the minimum wage, or their designated "regular pay day." (*Id.* ¶¶ 36, 47).

On February 1, 2018, Plaintiffs commenced their employment and moved into the Apartment. (*Id.* ¶ 41).  When the Residence was not occupied by the Murrays or their guests, Plaintiffs worked about three hours per day. (*Id.* ¶ 64).  On these days, Suarez performed household chores and Melo completed "project specific tasks," *e.g.*, cleaning carpets, and "[c]hef duties such as cataloging and shopping for stock items." (*Id.* ¶¶ 65–66).  Both parties understood that Plaintiffs "were not free to leave the [Residence] for a

majority of the time that [the Murrays] were absent," so as to run the Residence. (*Id.* ¶ 68).  Additionally, Carter Murray informed Plaintiffs in approximately September 2018 that their use of the Subaru would be limited to work-related purposes. (*Id.* ¶ 57).

When the Murrays or their guests stayed at the Residence, Plaintiffs worked fifteen-hour days, from approximately 6:30 a.m. to 11:00 p.m. (*Id.* ¶¶ 69–71).  On these days, "Plaintiffs would routinely be kept busy at all times." (*Id.* ¶ 72).  Specifically, Suarez catered to the needs of the Murrays and their guests and "maintain[ed] the cleanliness and functioning" of the Residence, while Melo prepared at least three meals a day and performed "light" household chores. (*Id.* ¶¶ 66, 70–72).  On the days immediately preceding the Murrays' arrival and following their departure, Plaintiffs worked approximately six-hour days. (*Id.* ¶ 73).

Plaintiffs also provided hospitality services to the Murrays on two family vacations. (*Id.* ¶¶ 93–105).  Specifically, Suarez "provid[ed] hospitality services to [the Murrays]" while they vacationed in Sag Harbor from August 22 to 26, 2018 on their yacht, the Olympus, and Melo provided "full hospitality services including cooking" to the Murrays while they vacationed in the Bahamas from February 8 to 16, 2020. (*Id.* ¶¶ 100–03).  Additionally, on four occasions, the Murrays rented out the Residence (with the exception of the Apartment) to paying tenants. (*Id.* ¶ 84).  When the Residence was rented out, Plaintiffs performed the same tasks for the renters as they did for the Murrays. (*Id.* ¶¶ 84, 86).

In addition, Plaintiffs allege to have worked at four "FCB hosted" events. (*Id.* ¶¶ 110, 119, 124, 133).  First, on September 20, 2018, Plaintiffs worked a "FCB event" on the Olympus. (*Id.* ¶ 110).  On this occasion, Melo cooked for Carter Murray and eight of his "business partners" while Suarez helped serve food and drinks. (*Id.* ¶¶ 111–18).

Second, in "Spring 2019," Carter Murray held an FCB luncheon ("Luncheon") at the

Residence attended by FCB Chief Creative Officer Susan Credle, a publicist and a writer.

(*Id.* ¶¶ 119–20).  Plaintiffs prepared the Main House, cooked, cleaned and "host[ed]" the

Luncheon. (*Id.* ¶ 123).  Third, in July 2019, FCB's annual staff appreciation party was

held at the Residence, during which time Plaintiffs "attend[ed] . . . to the Main House,"

ensured "the bathrooms were clean," "continually provided [towels] to FCB employees,"

and ensured that "intoxicated FCB employees did not dirty or damage" the Residence.

(*Id.* ¶¶ 124, 127–28).  Suarez prepared the main guest suite for one particular FCB

employee who stayed overnight at the Residence after the party. (*See id.* ¶ 125).  Suarez

"was to work for and take direction from this FCB employee during her stay." (*Id.* ¶ 126).

Fourth, on or about February 11 to 12, 2020, Carter Murray hosted a two day FCB

"workshop" event at the Residence.[2] (*Id.* ¶ 135).  In anticipation of this event, Suarez

tidied the Residence and helped clean the Barn where the workshop was held. (*Id.* ¶¶ 61,

135–39).

The Murrays did not keep accurate records of Plaintiffs' work hours or payment.

(*Id.* ¶¶ 74–75).  The Murrays' first payment to Plaintiffs was made only to Suarez "via

Chase QuickPay." (*Id.* ¶ 49).  Shortly thereafter, Carter Murray furnished Plaintiffs with

the only pay stub Plaintiffs received throughout their employ. (*Id.* ¶ 51).  With the

exception of the first payment received by Suarez,[3] the Murrays provided Plaintiffs with a

flat weekly wage of $403.85 for the duration of their employment. (*Id.* ¶ 76).  Plaintiffs

also received the following monetary payments from the Murrays: (1) Melo received

---

[2] Carter Murray flew home several days early from the Bahamas trip, discussed *supra*, to host the FCB workshop at the Residence. (SAC ¶ 32).

[3] The SAC does not indicate the amount of the first payment. (*See id.* ¶ 49).

$500.00 on February 16, 2020; (2) Suarez received $400.00 on September 2, 2018; (3)

Plaintiffs received $1,000.00 each on September 15, 2019; (4) Plaintiffs received $100.00

in September 2018; and (5) Plaintiffs received $250.00 each as a holiday bonus at the end

of 2018. (*Id.* ¶¶ 79–80).

On March 12, 2020, in response to the spread of the SARS-CoV-2 ("COVID-19")

pandemic in New York City, Carmen Murray informed Melo that the Murrays were

coming to the Residence the following day to "stay for at least two weeks" and as long as

the duration of the "shutdown due to the global pandemic." (*Id.* ¶ 181).  The Murrays

arrived at the Residence on March 13, 2020. (*Id.* ¶ 186).  Shortly thereafter, Suarez fell ill

and did not work on either March 17 or 18, 2020. (*Id.* ¶¶ 190–91).  The following day,

March 19, 2020, the Murrays terminated Plaintiffs' employment and removed them from

the payroll. (*Id.* ¶¶ 159–60).  Plaintiffs vacated the Apartment on April 19, 2020. (*Id.* ¶

163).

## B.  Procedural History

Plaintiffs filed the instant action on May 5, 2020 against the Murrays. (Docket No. 1)

("Complaint").  On July 6, 2020, the Murrays answered the Complaint and brought five

counterclaims against Plaintiffs. (Docket No. 13).  Plaintiffs filed their First Amended Complaint

("FAC") on July 27, 2020, adding FCB as a Defendant. (Docket No. 16).  In response,

Defendants submitted a pre-motion conference letter seeking leave to move to strike certain

allegedly defamatory pleadings in the FAC, and to dismiss the FAC's claims against FCB.

(Docket No. 32).  Plaintiffs responded, (Docket No. 36), and a pre-motion conference was held

on October 9, 2020.  At that conference, the undersigned granted Defendants leave to file

motions to strike and to dismiss. (October 9, 2020 Minute Entry).  Thereafter, on October 22,

2020, the parties submitted a proposed stipulation pursuant to which Plaintiffs agreed to file the

SAC, which would be "materially identically to the FAC but omit[]" the supposedly defamatory allegations, and Defendants agreed not to "re-file the Counterclaim in this proceeding." (Docket No. 37). The Court so-ordered the stipulation and Plaintiffs filed the SAC on October 23, 2020. (Docket Nos. 38–39). That same day, FCB filed the instant Motion to Dismiss Plaintiffs' claims against it. (Docket No. 40).

## II.  MOTION TO DISMISS STANDARD

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A court deciding a motion to dismiss must accept all of the factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The facts alleged must be more than legal conclusions. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (citing *Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (alteration, citation and internal quotations omitted)).

The court must also determine whether the factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common

sense." *Id.* at 679. "'[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,' a complaint is insufficient under Fed. R. Civ. P. 8(a) because it has merely 'alleged' but not 'show[n] that the pleader is entitled to relief.'" *19 Recordings Ltd. v. Sony Music Entm't.*, 165 F. Supp. 3d 156, 160 (S.D.N.Y. 2016) (quoting *Iqbal*, 556 U.S. at 679) (internal quotations omitted)).

## III.  DISCUSSION

The SAC alleges that FCB was a joint employer with the Murrays during the weeks of Plaintiffs' employ when FCB-related events were held at the Residence or on the Olympus. (SAC ¶¶ 257–87).  The SAC further alleges that FCB is liable to Plaintiffs for breaching quasi-contractual principles. (*Id.* ¶¶ 291–93).  FCB argues that the SAC does not plausibly allege that it was a joint employer or that it had quasi-contractual obligations to Plaintiffs. (Def. Br. at 12–16[4]).

### A.  Joint Employment

"The FLSA and the NYLL provide minimum wage and overtime pay requirements for covered, non-exempt workers who are employed by an enterprise engaged in commerce." *Murphy v. Heartshare Human Services of New York*, 254 F. Supp. 3d 392, 395 (E.D.N.Y. 2017); *see* 29 U.S.C. § 203(d); N.Y. Lab. L. § 190(3).  The FLSA's definition of "employ," which "includes to suffer or permit to work," has been construed "liberally to apply to the furthest reaches consistent with congressional direction." 29 U.S.C. § 203(g); *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 296 (1985) (quoting *Mitchell v. Lublin, McGaughy & Associates*, 358 U.S. 207, 211 (1959)).[5]  The federal and state labor laws further

---

[4] All page number citations to the record refer to the ECF page number unless otherwise noted.

[5] Generally, the FLSA and NYLL are given consistent interpretations. *See Topo v. Dhir*, No. 01 Civ. 10881(PKC), 2004 WL 527051, at *3 (S.D.N.Y. Mar. 16, 2004).  Accordingly, the "economic reality" test discussed *infra* is used

provide that "a worker may be employed by more than one entity at the same time," and hold

such joint employers jointly and severally liable for their statutory violations. *Zheng v. Liberty

Apparel Co. Inc*., 355 F.3d 61, 66 (2d Cir. 2003) (quoting 29 C.F.R. § 791.2 (2003)).

Courts recognize two types of joint employment relationships: vertical and horizontal

joint employment. *See Murphy*, 254 F. Supp. 3d at 396. Vertical joint employment exists where

an employee has a primary employer, referred to as an "intermediary employer," but the

employee is "economically dependent on" another employer "with regard to the work performed

for the" primary employer. *Id.* Horizontal joint employment exists when "two (or more)

employers each separately employ an employee and are sufficiently associated with . . . each

other with respect to the employee." *Id.* at 397 (quoting Opinion Letter from U.S. Dep't of

Labor, Wage & Hour Div., 2016 WL 284582, at *4 (Jan. 20, 2016) ("2016 DoL Opinion Ltr.")).

## 1. Vertical Joint Employment

The vertical joint employment analysis implements the "economic realities" test to

determine whether workers are "economically dependent" on a putative joint employer. *See id.* at

396. The economic reality inquiry is "based upon *all* the circumstances" of a given case, and as

such, should not be confined to "a narrow legalistic definition." *Herman v. RSR Sec. Servs. Ltd.*,

172 F.3d 132, 139 (2d Cir. 1999) (emphasis in original); *accord Barfield v. New York City

Health and Hospitals Corp.*, 537 F.3d 132, 141–42 (2d Cir. 2008) ("employment for FLSA

purposes [is] a flexible concept to be determined on a case-by-case basis by review of the totality

of the circumstances."). The Second Circuit has "identified different sets of relevant factors

based on the factual challenges posed by particular cases." *Barfield*, 537 F.3d at 142. "[T]he

overarching concern" underlying any formulation of the economic reality question "is whether

---

to determine FCB's joint employer status under both statutes. *See, e.g.*, *Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 342 n.25 (S.D.N.Y. 2005).

the alleged employer possessed the power to control the workers in question." *Herman*, 172 F.3d at 139.

Courts predominately apply two tests: the "formal control" test articulated in *Carter v. Dutchess Community College*, 735 F.2d 8 (2d Cir. 1984), and/or the "functional control" queries set forth in *Zheng* and *Block v. Superior Care, Inc.*, 840 F.2d 1054 (2d Cir. 1988).[6] *See Granda v. Trujillo*, No. 18 CIV. 3949 (PAE), 2019 WL 367983, at *5 (S.D.N.Y. Jan. 30, 2019). First, the *Carter* test considers whether an entity had formal control of the workers and asks whether the entity:

> (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.

*Barfield*, 537 F.3d at 142. "No one of the four [*Carter*] factors standing alone is dispositive," *Herman*, 172 F.3d 139, and courts may take other considerations into account, *see Zheng*, 355 F.3d at 68 ("other factors that bear on the relationship between workers and potential joint employers should [not] be ignored."). Further, the formal control test is narrower than the functional control inquiry. *See Carter*, 735 F.2d at 12. Thus, "the exercise of formal control over employees is sufficient, but not necessary, to adequately allege an employer relationship." *Liu v. Canteen 82 Inc.*, 17 Civ. 7862 (KPF), 2018 WL 6067228, at *5 (S.D.N.Y. Nov. 20, 2018) (citing *Carter*, 735 F.2d at 12).

Second, *Zheng* sets forth six non-exclusive factors to assess whether a putative employer possessed functional control over the workers:

---

[6] Since neither party contends that the factors articulated in *Superior Care* apply to the instant dispute, and the Second Circuit has held that the *Superior Care* test is primarily aimed at distinguishing between a worker and an independent contractor, not for determining "by whom workers who are assumed to be employees are employed," the Court will not analyze Plaintiffs' claims under the *Superior Care* factors. *See Greenawalt v. AT & T Mobility LLC*, 642 F. App'x 36, 37 (2d Cir. 2016).

> (1) whether the alleged employer's equipment and premises were used for the [plaintiffs'] labor; (2) whether [plaintiffs'] labor could shift as a unit from one putative joint employer to another; (3) [the extent to which plaintiffs] performed [a] discrete line-job [that was] integral to the alleged employer's production process; (4) whether a subcontractor could pass responsibility to another subcontractor without material changes; (5) the degree to which the alleged employer [or their agents] supervised [plaintiffs'] labor; and (6) whether [plaintiffs] labored exclusively or predominantly for the alleged employer.

*Youngfu v. An Ju Home, Inc.*, 19-CV-5616 (JPO), 2020 WL 3510683, at *5 (S.D.N.Y. June 29, 2020) (internal quotations omitted).  The "Second Circuit has clarified . . . that the *Zheng* factors are most relevant in the context of subcontractor relationships," *Granda*, 2019 WL 367983, at *5, while the *Carter* factors "bear directly on whether workers who are already employed by a primary employer are also employed by a second employer," *Zheng*, 355 F.3d at 68; *see also Granda*, 2019 WL 367983, at *7 (declining to analyze the *Zheng* factors "[b]ecause the functional test set out in *Zheng* focuses on distinguishing between subcontractors and employees, a context not at issue" in the dispute before the court); *Greenawalt*, 642 Fed. App'x at 37 (solely applying the *Zheng* factors, which are most applicable to subcontractor relationships). Nevertheless, consistent with the FLSA's "flexible approach" to determining joint employment status, it is not uncommon for courts to consider both the *Carter* and *Zheng* factors. *See, e.g.*, *Fernandez v. HR Parking Inc.*, 407 F. Supp. 3d 445, 452–61 (S.D.N.Y. 2019); *Yongfu Yang*, 2020 WL 3510683, at *3–5.

## 2. Horizontal Joint Employment

Horizontal joint employment may be found where "one employer employs a worker for one set of hours in a workweek and another employer employs the same worker for a separate set of hours in the same workweek." 29 C.F.R. § 791.2(e)(2).  In these circumstances, "[t]here is typically an *established or admitted* employment relationship between the employee and *each of the employers*." 2016 DoL Opinion Ltr., at *5 (emphasis added).  The analysis thus focuses on

"the relationship between the two (or more) employers." *Id.* For instance, "where a waitress works for two separate restaurants that are operated by the same entity," the relevant inquiry is "whether the two restaurants are sufficiently associated with respect to the waitress such that they jointly employ the waitress." *Id.* Factors pertinent to finding horizontal joint employment include: "whether there are common officers or directors of the companies . . . whether employees have priority for vacancies at the other companies; whether there are any common insurance, pension or payroll systems; and whether there are any common hiring seniority, recordkeeping or billing systems." *Murphy*, 254 F. Supp. 3d at 399 (quoting Opinion Letter Fair Labor Standards Act (FLSA), 2005 WL 6219105, at *2 (June 14, 2005)).[7]

### 3. Plaintiffs' FLSA and NYLL Claims Against FCB (Causes of Action 1–6)

FCB argues that it was not a joint employer with the Murrays under the FLSA or NYLL and that the SAC fails to allege facts satisfying a single *Carter* factor. (Def. Br. at 12). Plaintiffs counter that FCB was a joint employer with the Murrays "during the work weeks that included . . . FCB's corporate events," and that the court should look to the economic reality of Plaintiffs' relationship with FCB without rigid adherence to a specific test. (Pl. Opp. at 12, 14–18) (alternations omitted). Plaintiffs cite to authorities setting forth various tests to determine joint employment, specifically: the formal control test, (*id.* at 14–15), the *Zheng*[8] factors, (*id.* at 13),

---

[7] The DoL also articulates nine questions that "may be useful in assessing the degree of association between potential horizontal joint employers." *Murphy*, 254 F. Supp. 3d at 398–99. The DoL instructs courts to ask: "who owns the potential joint employers (i.e., does one employer own part or all of the other or do they have any common owners); do the potential joint employers have any overlapping officers, directors, executives, or managers; do the potential joint employers share control over operations (e.g., hiring, firing, payroll, advertising, overhead costs); are the potential joint employers' operations inter-mingled (for example, is there one administrative operation for both employers, or does the same person schedule and pay the employees regardless of which employer they work for); does one potential joint employer supervise the work of the other; do the potential joint employers share supervisory authority for the employee; do the potential joint employers treat the employees as a pool of employees available to both of them; do the potential joint employers share clients or customers; and are there any agreements between the potential joint employers." *Id.* at 399 (quoting 2016 DoL Opinion Ltr. at *6–7).

[8] Plaintiffs depend on *Zheng* to support their incorrect contention that Defendants' "exclusive reliance" on the *Carter* factors is "patently inappropriate" and has been "repudiated" by the Second Circuit. (Pl. Opp. at 10). *Zheng* did not repudiate *Carter*. *See Zheng*, 355 F.3d at 67–68. Instead, the *Zheng* court provided additional factors,

and the horizontal joint employment test, (*id.* at 16–17), but do not specifically identify which test should be used to analyze the instant dispute.  In reply, Defendants argue that the *Carter* factors "provide the relevant framework for a joint employer analysis," and in the alternative, that the SAC does not allege facts satisfying any of the *Zheng* factors. (Def. Reply at 8–11). Although Plaintiffs' opposition cites to cases discussing horizontal joint employment, (*see id.* at 16–17),[9] the circumstances contemplated by the horizontal joint employment test, which focuses on whether multiple entities are sufficiently related to be treated as a single entity for purposes of the FLSA, are not present here. *See Murphy*, 254 F. Supp. 3d at 399 (it is well-settled that where, as here, the court must determine whether "a defendant who is claiming not to be an employer should be considered one under the FLSA," the "[e]conomic realities' factors are applied."). Consequently, the Court will not analyze whether FCB was a horizontal joint employer.[10] *Cf. id.*

---

specific to subcontractor relationships, that may aid courts in analyzing the economic realities of an employment relationship. *See id.* at 68 (noting that the *Carter* test is largely useful but "other factors" bearing on the employment relationship "should [not] be ignored.").

[9] Plaintiffs allege that *Murphy v. Heartshare Human Services of New York*, 254 F. Supp. 3d 392, 402 (E.D.N.Y. 2017) is "analogous" to the instant matter. The Court disagrees.  *Murphy* addressed whether a school and a residence for students with disabilities, run by separate non-profit organizations, were "joint employers" for purposes of FLSA's overtime provisions. *See id.* at 393.  The parties in *Murphy* agreed that the plaintiffs were "employed as education and childcare professionals" by *both* the school and the residence, and that the horizontal relationship test applied to the dispute. *Id.* at 394, 400.  The court assessed the relationship between the school and the residence and found that the entities were horizontal joint employers since they "were in part created to serve the same clients, are headquartered at the same address, physically operate out of the same address, share employees, share an accounting and human resources department, require employees to perform tasks that simultaneously benefit both employers, and share a name." *Id.* at 404.

[10] Plaintiffs aver in their opposition, but not in the SAC, that: (i) there was an "arrangement between . . . [FCB and Carter Murray] to share the employee's [sic] services;" (ii) "[b]oth . . . Carter Murray and . . . FCB 'act[ed] directly or indirectly in the interest of an employer in relation to an employee;" and (iii) "FCB and Carter Murray 'did share control of the employee.'" (Pl. Opp. at 16 (quoting 29 C.F.R. §791.2(e)(2))).  It is well-established that "plaintiffs cannot use their opposition to the motion to dismiss to raise new claims or arguments." *Kiryas Joel Alliance v. Village of Kiryas Joel*, No. 11 Civ. 3982(JSR), 2011 WL 5995075, at *6, n.3, 6, 9 (S.D.N.Y. Nov. 29, 2011).  Thus, these assertions, which are not included in the SAC, cannot be considered for purposes of a motion to dismiss. *See Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 390 n.19 (S.D.N.Y. 2013).  Moreover, had the SAC included these allegations, they would not be taken as fact since they are merely quotations from pertinent federal regulations and are wholly conclusory. *See, e.g.*, *Tieman v. City of Newburgh*, No. 13-CV-4178 (KMK), 2015 WL 1379652, at *14 (S.D.N.Y. Mar. 26, 2015).  In any event, these contentions are only relevant to the horizontal joint employer analysis, which, as discussed *supra*, does not apply to the present dispute. *See Murphy*, 254 F. Supp. 3d at 399.

(quoting American Bar Association Section on Labor and Employment Law, Employment

Rights and Responsibilities Committee, Joint Employer Liability Under the FLSA: Wage and

Hour Claims by Employees of Subcontractors and Litigation Issues Involving Undocumented

Workers 4 n.18 (2016) ("Cases where the entities alleged to be joint employers have common

ownership are not analyzed under the 'economic realities' test.  Those cases are deemed by

courts to be of 'horizontal' joint employment and are analyzed using the regulations found in 29

C.F.R. § 791.2(b).")).

While the Court agrees that the *Carter* factors provide the most relevant framework for

evaluating the instant dispute, *see, e.g.*, *Granda*, 2019 WL 367983, at *5, the Court will also

analyze Plaintiffs' claims under the broader test set forth in *Zheng*.

### i.  *Carter* Factors

Defendants argue that the SAC does not satisfy any of the *Carter* factors. (Def. Br. at 11–

14).  Plaintiffs do not apply the *Carter* factors to the instant dispute. (*See generally* Pl. Opp.).

### a.  Power to Hire or Fire

Regarding FCB's power to hire or fire Plaintiffs, the SAC includes only the threadbare

assertion that: "[b]oth [the Murrays] and FCB had the power to hire and fire Plaintiffs with

respect" to the four FCB corporate events articulated therein. (SAC ¶ 148).  This conclusory

allegation is insufficient to support the inference that FCB was empowered to hire or fire

Plaintiffs.  Plaintiffs do not allege that they interviewed or signed an employment agreement

with FCB or interacted with FCB's human resources department. (*See* Def. Br. at 12).  Nor does

the SAC allege that FCB onboarded or terminated Plaintiffs in connection with any of the four

FCB corporate events held at the Murrays' Residence, or that FCB was a party to the

Employment Agreement executed at the outset of Plaintiffs' employ.

Instead, the SAC asserts that the Murrays, at all pertinent times, possessed the exclusive authority to hire and fire Plaintiffs.  With respect to hiring, Carter Murray conducted virtual and in-person interviews of Plaintiffs, paid for Plaintiffs' transportation to the Residence for their in-person interview, formally offered Plaintiffs their positions, and sent Plaintiffs a contract memorializing the negotiated terms of their employment. (SAC ¶¶ 24, 27–28, 30–31). Regarding termination, Carter Murray personally terminated Plaintiffs' employment and removed them from his payroll on March 19, 2020, six days after the family came to the Residence to "shelter in place" for the duration of the shutdown due to the COVID-19 pandemic. (*Id.* ¶¶ 159, 181).  Further, the SAC clearly sets forth claims against the Murrays, not FCB, for *the Murrays*' alleged failure to satisfy their contractual obligation to provide Plaintiffs with 30 days' notice of termination. (*Id.* ¶¶ 39–40).  In sum, the SAC does not allege any facts demonstrating that FCB played a role in deciding whether to hire or terminate the Plaintiffs. *Cf. Carter*, 735 F.2d at 12 (alleged joint employer's ability to select from among eligible inmates for a teaching assistant position at a community college, although qualified by the prison's "ultimate" veto-power, weighed in favor of finding joint liability).  Thus, the first factor weighs against a finding that FCB had formal control over Plaintiffs' work.

**b.  Supervision and Control of Work Schedules or Conditions of Employment**

Plaintiffs' allegations that "[the Murrays] and FCB possessed substantial control over Plaintiffs' working conditions," "work schedules," and the "conditions of [Plaintiffs'] employment" with respect to the four FCB corporate events, (SAC ¶¶ 147, 149–50), and that Plaintiffs' "employment with respect to the [Residence] and FCB is inextricably linked," (*id.* ¶ 155), are conclusory and "not entitled to the assumption of truth" on a motion to dismiss. *See Iqbal*, 556 U.S. at 678; *Huer Huang v. Shanghai City Corp.*, 459 F. Supp. 3d 580, 589 (S.D.N.Y

2020) (allegations that are merely a "formulaic recitation of the elements of a cause of action" are not assumed to be true for purposes of a motion to dismiss).

The only non-conclusory assertion in the SAC relevant to this factor is that during the FCB staff party held at the Residence, Suarez "prepare[d] the main guest suite . . . for one FCB employee," and "was to work for and take direction from this FCB employee during her stay." (SAC ¶ 125). However, the SAC does not allege that the FCB employee *actually* exercised any "supervision over [Suarez's] schedule[]" or "the conditions of [Suarez's] employment." *See Fernandez*, 407 F. Supp. 3d at 453. Nor does the SAC allege that the FCB employee controlled Plaintiffs' labor in her capacity as an agent of FCB. To the contrary, the SAC states that "Carter Murray demanded that Plaintiffs work at [the four] FCB events," which demonstrates that the Murrays, not the unnamed FCB employee, controlled the terms of Plaintiffs' work schedule and conditions with respect to the FCB event at issue. (SAC ¶ 106).

The SAC further supports the inference that the Murrays controlled the conditions of Plaintiffs' labor during their entire employ, including at the alleged FCB-related events. For instance, Plaintiffs allege that "Defendant [Carter] Murray agreed to provide Plaintiffs with an automobile for their use," upon hiring them, and thereafter, "[i]n or about September 2018, Defendant Carter Murray advised Plaintiffs that they no longer had unlimited use of the . . . automobile." (*Id.* ¶¶ 30, 57). Moreover, the SAC alleges that Suarez was required to meet "Carmen Murrays' demanding standards." (*Id.* ¶ 70).

Additionally, the SAC alleges that Plaintiffs were contractually obligated, per the Employment Agreement, to perform tasks like preparing the Main House for, and accommodating the needs of, Carter Murray's business associates. (*Id.* ¶¶ 33, 71). Plaintiffs' job duties for the Murrays explicitly included "traditional bed turn-up and turn-down service," and providing fresh linens and towels to the Murrays and their "invitees," including their "business

- 16 -

associates." (*Id.*).  Indeed, the SAC asserts that during the staff appreciation party, Suarez

preformed her typical duties pursuant to the Employment Agreement, which expressly required

Plaintiffs to "devote full-time care to the real property," when "invitees including . . . business

associates" were "occup[ying] . . . the residence." (*Id.* ¶ 33).

Furthermore, Plaintiffs performed their typical, contractually enumerated duties at all of

the FCB-related events in question. (*See* SAC ¶¶ 106–23, 131–43).  At the event on the

Olympus, Plaintiffs performed "hospitality and butler services," went grocery shopping, cooked,

served refreshments and cleaned-up after the guests. (*Id.* ¶¶ 113–17).  Similarly, Plaintiffs

cooked, hosted, cleaned and "provided hospitality and butler service" at the Luncheon,

"attend[ed] to" the Main House and prepared a guest's room in connection with the staff

appreciation party, and cleaned, provided turn-down service, refreshed linens and otherwise

made the "Main House . . . presentable" during the FCB workshop event. (*Id.* ¶¶ 123, 125, 127,

135).

In short, Plaintiffs have not plausibly alleged that FCB supervised or controlled their

employment at any of the FCB-related events.  The SAC alleges that the Murrays alone

determined the terms, conditions and scheduling of Plaintiffs' labor during the entirety of

Plaintiffs' employ, including during the FCB-related events.

### c.  Determination of Rate and Method of Payment

The SAC alleges that "[the Murrays] and FCB determined the rate and method of

payment with respect to the foregoing FCB events." (*Id.* ¶ 151).  This allegation is conclusory

and is not supported by any factual content. *See Huer Huang*, 459 F. Supp. 3d at 588–89.

The SAC establishes that the Murrays, and no-one else, controlled the rate and method of

Plaintiffs' payment.  The Employment Agreement expressly provided that the Murrays would

pay Plaintiffs a combined salary of $3,500.00 per month. (SAC ¶ 35).  FCB was never a party to

the Employment Agreement and played no role in negotiating its terms. *See Jean-Louis v. Metro.*
*Cable Comm's, Inc.*, 838 F. Supp. 2d 111, 128 (S.D.N.Y. 2011) (the facts that the contract
between plaintiffs and defendant set the terms of plaintiffs' payment, and that the alleged joint
employer was not a party to, and played no role in negotiating the contract, "weigh[ed] strongly"
against finding joint employment).  Furthermore, the Murrays paid Plaintiffs their weekly
salaries and gave Plaintiffs the tips and holiday bonus they received during their employ. (SAC
¶¶ 77–82).

Additionally, the SAC's allegation that "[u]pon information and belief," the paystub
given to Plaintiffs "was sent to . . . Carter Murray's office at FCB" does not show that FCB set
the rate and method of Plaintiffs' payment. (*Id.* ¶ 52).  For the foregoing reasons, this factor
weighs against finding FCB to be a joint employer. *Cf. Yongfu Yang*, 2020 WL 3510683, at *4
(finding that the "rate and method of payment" factor cut against a finding of formal control
where the plaintiffs therein asserted that the defendant, as opposed to the proposed joint
employer, "promised to pay" the plaintiffs).

**d.  Maintenance of Employment Records**

The SAC does not allege that FCB maintained employment records concerning any
aspect of Plaintiffs' employ at the Residence including Plaintiffs' work hours.  This factor thus
weighs against a finding that FCB was a joint employer. *See Martin v. Sprint United Mgm't Co.*,
237 F. Supp. 3d 404, 429 (S.D.N.Y. 2017) (fact that putative joint employer did not record the
number of hours worked by the individual, which is the most relevant subject of documentation
for FLSA purposes, weighed against finding the entity to be a joint employer).

In conclusion, Plaintiffs have not plausibly alleged facts tending to establish any of the
*Carter* factors.  Plaintiffs have thus failed to satisfactorily plead that FCB formally controlled
their work during the FCB-related events at issue.

### ii. Functional Control

The Court additionally considers whether FCB had functional control of Plaintiffs' work by applying the *Zheng* factors.  Plaintiffs cite to *Zheng* throughout their opposition, but do not apply the instant facts to the factors articulated therein. (*See generally* Pl. Opp.).  Defendants, however, argue why each of the *Zheng* factors is not satisfied. (Def. Reply at 9–11).  The Court agrees that the SAC does not satisfy any of the *Zheng* factors.

The first factor asks whether FCB's "equipment and premises" were used for Plaintiffs' labor. *Cf. Godlewska v. HDA*, 916 F. Supp. 2d 246, 262 (E.D.N.Y. 2013) ("the shared use of premises and equipment may support the inference that a putative joint employer has functional control over the plaintiffs' work."), *aff'd sub nom. Godlewska v. Human Dev. Ass'n, Inc.*, 561 F. App'x 108 (2d Cir. 2014).  The SAC alleges that the premises where Plaintiffs worked and the equipment that they used belonged exclusively to the Murrays.  All four of the FCB-related events took place at the Murrays' Residence or on their yacht. (SAC ¶¶ 19–20, 93).  Further, the Subaru that Plaintiffs used for work-related purposes was leased by Carter Murray. (*Id.* ¶ 37).  In opposition, Plaintiffs highlight the SAC's allegation that the Residence is listed as an "offsite" meeting space in FCB marketing materials. (*Id*. ¶ 21; Pl. Opp. at 15).  The fact that the Residence was marketed as an offsite meeting space does not plausibly show that the Residence "could be considered [FCB's] premises," in light of the express affirmations in the SAC that the Residence was owned by the Murrays. *See Yongfu Yang*, 2020 WL 3510683, at *5; (SAC ¶ 21).  This factor thus weighs against finding that FCB had functional control of Plaintiffs.

The second factor assesses whether Plaintiffs' labor could shift "from one putative joint employer to another." *See Barfield*, 432 F. Supp. 2d at 392.  The SAC does not allege a single instance where Plaintiffs' labor shifted to FCB.  Furthermore, the SAC

alleges that Plaintiffs worked full-time (and over-time) for the Murrays. (SAC ¶¶ 64–66, 69–71). Indeed, the SAC alleges that "[the Murrays] required that Plaintiffs be present and were not free to leave the [Residence] for a majority of the time that [the Murrays] [were] absent so as to run the [Residence]." (*Id.* ¶ 68).

The only allegation relevant to this factor is that Suarez was instructed "to take direction" from an unnamed FCB employee during the staff appreciation party. (SAC ¶ 126). However, as discussed, *supra*, the SAC does not allege that Suarez actually took direction from that FCB employee, or that the employee was acting as an agent of FCB, as opposed to in her personal capacity, when she was supposedly authorized to give Suarez directives. Thus, this factor cuts against finding a joint employer relationship.

The third factor analyzes the extent to which Plaintiffs "perform[ed] a discrete line-job" that was integral to the alleged joint employer's "process of production." *See Zheng*, 355 F.3d at 72. This factor recognizes the FLSA's "special status" for "work on a production line," and thus does not apply to the present facts. *Id.* at 73 (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947)). Regardless, Plaintiffs performed hospitality services at the four events in question, which were not "integral" to the production process of FCB, an international advertising firm. *See id*. at 72.

The fourth factor asks whether "responsibility under the contracts could pass from one subcontractor to another without material changes." *Zheng*, 355 F.3d at 72. The SAC does not allege that Plaintiffs were employed by subcontractors, and the only contract identified in the SAC was executed exclusively between Plaintiffs and the Murrays. Thus, to the extent the fourth factor is applicable, it weighs against a finding that FCB was a joint employer.

The fifth factor asks whether the putative joint employer or its agents[11] supervised Plaintiffs.  As discussed, *supra*, the SAC does not allege that FCB supervised Plaintiffs' work or controlled the terms, conditions and timing of their employment. *See supra*, Section III(A)(3)(i)(b).  Thus, the fifth factor also weighs against finding that FCB is a joint employer under *Zheng*.

The sixth factor assesses whether Plaintiffs worked "exclusively or predominately" for FCB. *Zheng*, 355 F.3d at 72.  The SAC identifies four occasions, over more than two years of employment, that Plaintiffs purport to have been jointly employed by the Murrays and FCB. (*See* SAC ¶¶ 110, 119, 124, 133).  Thus, the SAC does not allege that Plaintiffs worked predominately for FCB.  In fact, the SAC alleges that Plaintiffs worked predominantly (if not exclusively) for the Murrays. (*See, e.g.*, *id.* ¶¶ 32– 33, 68).  Consequently, this factor cuts against a finding of joint employer liability.  In sum, Plaintiffs have not satisfied any of the *Zheng* factors and have failed to plausibly assert that FCB functionally controlled their work.

Accordingly, the SAC does not plausibly allege that FCB was a joint employer during the four weeks that Plaintiffs worked at FCB-related events held on the Murrays' property.

## B.  Quasi-Contract Claim (Cause of Action 8)

The SAC alleges that "[the Murrays] and FCB have violated quasi-contractual standards including unjust enrichment, quantum meruit and promissory estoppel." (SAC

---

[11] Plaintiffs argue in their opposition that "Carter Murray acted as an agent of Defendant FCB . . . when he controlled Plaintiffs' employment during the four weeks [that] Plaintiffs worked [at] . . . FCB's corporate events." (Pl. Opp. at 10).  By contrast, the SAC alleges that Carter Murray, as the CEO of FCB, "controls," *i.e.*, is the principle of, FCB. (*Id.* ¶ 144).  Since the SAC does not allege that Carter Murray is an agent of FCB, this argument cannot be considered on a motion to dismiss. *See Chamberlain*, 986 F. Supp. 2d at 390 n.19.  Accordingly, the Court will not consider Plaintiffs' claim that FCB is liable as an agent of Carter Murray. *See, e.g.*, *Scalpi v. Town of Fishkill*, Case No. 14-CV-2126 (KMK), 2016 WL 858944, at *12 n.14 (S.D.N.Y Feb. 29, 2016).

¶ 292).  FCB argues that the SAC does not state a claim against FCB for quasi-contractual violations. (Def. Br. at 15–16).  Plaintiffs do not address FCB's arguments to dismiss their quasi-contract claim in their opposition.  Where a plaintiff fails to address the legal sufficiency of its claims in opposition to a motion to dismiss, those claims are considered waived. *See Fair Housing Justice Ctr., Inc. v. Cuomo*, 18-CV-3196 (VSB), 2019 WL 4805550, at *16 (S.D.N.Y. Sept. 30, 2019) (dismissing claims that plaintiff did not address in its opposition brief) (citing *Norton v. Sam's Club*, 143 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived")). Accordingly, Plaintiffs' failure to address their quasi-contract claim in their opposition is tantamount to a concession that the SAC does not plausibly allege that FCB is liable for a breach of quasi-contractual standards. *See id.*

## IV. CONCLUSION

For the foregoing reasons, Defendant FCB's Motion to Dismiss is granted in its entirety and Plaintiffs' SAC is dismissed against FCB with prejudice.  The Clerk is respectfully requested to terminate the pending motion (Docket No. 40).

Dated:     April 2, 2021
           White Plains, New York

**SO ORDERED:**

JUDITH C. McCARTHY
United States Magistrate Judge